# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MARIA LOUISE FRATANTION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 13 C 648 |
| v. | ) | |
| | ) | Judge Jeffery Cole |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Maria Fratantion, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Title II and XVI of the Social Security Act as amended ("Act"), 42 U.S.C. §§ 423(d)(2); 1382(a)(1)(B). Ms. Fratantion asks the court to reverse the Commissioner's final decision, or in the alternative, remand the case for further review. The Commissioner seeks an order affirming the decision.

### I.
### PROCEDURAL HISTORY

Ms. Fratantion applied for SSI and DIB on August 21, 2009, alleging that she had been disabled since April 1, 2007 due to intractable lower back and hip pain. (Administrative Record ("R.") 39, 41, 80, 142, 177). Her application was denied initially on December 1, 2009, and upon reconsideration on April 14, 2010. (R. 15, 80, 81, 82-86, 88-91). Ms. Fratantion continued pursuit of her claim by filing a timely request for hearing on May 10, 2010. (R. 15, 96-97, 99, 100-101).

An Administrative Law Judge ("ALJ") convened a hearing on November 17, 2010, at which Ms. Fratantion, represented by counsel, appeared and testified. (R. 15, 33, 120-124, 126-131). In addition, Grace Gianforte testified as a vocational expert, and Leah Fratantion, Ms. Fratantion's daughter, testified on her mother's behalf. (R. 15, 33, 64-68). On January 6, 2011,

the ALJ issued a decision finding Ms. Fratantion not disabled because although she could no longer perform her past work as a food server and preparer, she could perform sedentary work as a security monitor; addresser; and document preparer. All of which existed in significant numbers in the national economy. (R. 15, 20, 28-29); *see* 20 C.F.R. §§ 404.955; 404.981. This became the final decision of the Commissioner when the Appeals Council denied Ms. Fratantion's request for review of the decision on March 2, 2011. (R. 1-6). Ms. Fratantion appealed that decision to the federal court under 42 U.S.C. § 405(g) and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## THE EVIDENCE OF RECORD

### A.
### The Vocational Evidence

Ms. Fratantion was born on December 2, 1962, making her forty-seven years of age at the time of the ALJ's decision. (R. 39, 80, 163). She is approximately 5' 7", and at the time of the hearing, weighed two hundred and thirty-one pounds. (R. 363, 416). She graduated high school, took two years of general college courses, and she is able to communicate in English. (R. 39, 176). Ms. Fratantion worked a handful of different jobs before her medical ailments caused her to cease working. These jobs included a magazine merchandiser from 1999 to 2000, a retail sales clerk selling bath products from October 2002 to January 2003, and as a food server/preparer in elementary and high school cafeterias from 2004 to 2007. (R. 39-40, 166-170, 178-179). As a magazine merchandiser, she would deliver and stock new magazine orders at various stores throughout her community. (R. 168-169, 178). This required Ms. Fratantion to lift large bundles of new and old magazines, as well as significant amounts of kneeling, stooping, and crouching. (R. 168-169). In October 2002, she took a seasonal job as a retail clerk at a bath

products store during the Christmas holiday season. (R. 169-170). Ms. Fratantion explained that the job was not difficult: she stood for eight hours each day, five days a week, and lifted supplies baskets weighing approximately ten to fifty pounds. (R. 169-170).

Ms. Fratantion most recently worked for Sodexo as a food server/preparer which required frequent lifting of cases of meat, cheese, lettuce, tomatoes, and pots and pans weighing twenty-five to fifty pounds. (R. 167-168, 178-179). She had to stand, walk, and handle large objects for seven and one half hours per day. (R. 167-168, 178-179). This put a lot of strain on her body and she eventually stopped working because "she couldn't stand the pain anymore." (R. 177).

## B.
## The Medical Evidence

On October 16, 2008, Ms. Fratantion woke up in the morning with severe hip and lower back pain. (R. 41-42). She was examined at Edward Hospital ("Hospital") in Naperville, Illinois, and the emergency physician's report indicated that her left hip pain began four days prior. (R. 285). She was diagnosed with bursitis in the past and alleged some flare ups, but none causing such severe pain. (R. 285). She reported no numbness or weakness, however, the pain radiated from her lower left midline, and radiated through her buttocks, and down the entire left leg. (R. 285). X-rays revealed significant degenerative change with disk space narrowing in her lower back, while the hip showed no obvious fracture or degenerative changes[1]. (R. 286). The emergency physician, Dr. Sims, provided Ms. Fratantion with narcotic pain medication and anti-inflammatories, which resulted in "very good improvement of her symptoms" as she was up and ambulating in the hallway. (R. 286). Upon discharge, Dr. Sims diagnosed her with sciatica, and

---

[1] The Edward Hospital Department of Radiology report indicated moderate disc space narrowing at L5-S1, mild degenerative spurring at L-3 through L-5 anteriorly, but no evidence of spondylolysis, or spondylolisthesis. (R. 315). Additionally, Dr. Sims' report indicates that Ms. Fratantion underwent magnetic resonance imagining ("MRI") in September 2002, which revealed disk bulging at L4 and L5 with minimal narrowing of the neuroforamina. (R. 285-286).

recommended warm compresses, rest, a follow-up examination with her primary care physician, and narcotic pain medications. (R. 286). Dr. Sims instructed Ms. Fratantion that further action such as imaging, specialist consultation, or physical therapy may become necessary. (R. 286).

Ms. Fratantion saw Dr. Rabin, a neurosurgeon, on November 5, 2008, because her lower back pain persisted. (R. 333). Dr. Rabin reported that a recent MRI indicated mild-to-moderate spinal stenosis at L4-L5, and to a lesser degree at L3-L4. (R. 333). Her neurologic examination revealed her strength to be five-out-of-five in all muscle groups tested, her reflexes to be bilaterally symmetric, no evidence of clonus or spasticity; her hip evaluation was unremarkable. (R. 333). However, Dr. Rabin noted that she admitted to walking in a stooped position consistent with spinal stenosis. (R. 333). This led to a thorough discussion of the possibility of proceeding with a decompressive laminectomy to alleviate her symptoms. (R. 333).

Ms. Fratantion underwent a decompressive lumbar laminectomy, L3-S1, on November 25, 2008, performed by Dr. Rabin. (R. 22, 42, 80, 81, 86, 91, 177). The operative report indicated tighter stenosis than originally diagnosed, predominately at L4-L5, but Ms. Fratantion tolerated the procedure well. (R. 287, 345-346). Dr. Aliga performed a postoperative consultation on Ms. Fratantion and reported that her left thigh pain had improved since surgery yet she still experienced some numbness on the right side, as well as lower extremity weakness and pain that was likely reactive radiculopathy. (R. 289-291). Treatment notes indicated that she was able to ambulate with a walker with minimal assistance as well as perform hygiene routines on both her upper extremities with minimal supervision, and lower extremities with moderate assistance. (R. 289). Following surgery, Ms. Fratantion spent approximately a week and a half in an acute rehabilitation center to receive twenty-four hour care for her wound to ensure proper healing and avoidance of any complications. (R. 290-291).

Ms. Fratantion returned to the Hospital on December 7, 2008, complaining of a high fever. (R. 22, 292). She reported to Dr. Sims that she had awakened in the morning to a large amount of bloody drainage coming from her surgical wound, and that the incision was causing some discomfort. (R. 292). Dr. Rabin examined Ms. Fratantion, and noted that her preoperative symptoms in her legs were resolved, her strength was fully intact; however, she had a fever of 102°, and there was wound drainage. (R. 295). Dr. Augustinsky followed up with an infectious disease consultation and reported Ms. Fratantion's pain had markedly improved, but the incision had begun causing discomfort. (R. 296, 332). Dr. Augustinsky concluded that her wound was infected, and recommended re-exploration surgery followed by prolonged intravenous antibiotics to combat the infection. (R. 297).

Dr. Rabin performed re-exploration surgery which revealed gross infection with necrotic debris above the fascial layer caused by staph aureus infection. (R. 270, 299-301, 304). Dr. Rabin successfully debrided the infected tissue and Ms. Fratantion was later discharged from the Hospital on December 16, 2008, in stable condition. (R. 304, 309, 343). However, approximately two weeks later, she saw Dr. Sayeed at DuPage Valley Pain Specialists complaining of lower back pain near the incision site, and numbness down both legs towards the knees. (R. 336, 338). Dr. Sayeed indicated that her worst symptoms were in her lower back region. (R. 336, 338). The record indicates that her motor strength was five-out-of-five and equal in hip flexion, knee extension, as well as dorsiflexion and plantar flexion in both lower extremities. (R. 337, 339). Subsequently, Dr. Sayeed increased her pain medications, but noted that she would follow up in two weeks and, at that time, he would initiate reduction of her medications. (R. 337, 339).

Ms. Fratantion saw Dr. Rabin five more times in January 2009, complaining of drainage and discomfort at her incision site.[2] (R. 327-331). Dr. Rabin monitored the incision site for a few weeks before suggesting a procedure to remove the Vicryl suture, which he believed to be the cause of the discomfort. (R. 327-331). Instead, Ms. Fratantion decided to see the Edward Wound Clinic for an examination of the wound. (R. 327-331). Her wound care progress note from February 3, 2009, indicated some drainage from the wound site as well as chronic pain. However, Dr. Hahm reported the wound was almost fully healed. (R. 307-308, 340-341, 432-433). Dr. Rabin reported that the wound properly healed, that she no longer had pain at the incision site, that she was walking better, and that her symptoms have improved. (R. 325, 326, 342).

Shortly thereafter, Ms. Fratantion returned to Dr. Rabin's office complaining of pain in her leg and lower back pain she had not experienced prior to surgery. (R. 324). Dr. Rabin opined that the symptoms most likely resulted from irritation caused by the infection, and recommended she begin physical therapy. (R. 324). Ms. Fratantion's pain persisted and on April 14, 2009, her primary care physician, Dr. Rozner, ordered an MRI of her lower back. (R. 322, 323, 426-427). The MRI appeared largely unremarkable and revealed no areas of abnormal enhancement, no disk herniations, or evidence of stenosis. (R. 323, 436). At this time, Dr. Rabin reported that Ms. Fratantion continued to make progress, show improvements in her lower back pain, and that her strength was intact. (R. 323).

Ms. Fratantion began seeing Dr. Mikuzis, a physician, at Action Physical Medicine and Rehabilitation. (R. 377). Between May 13, 2009, and October 1, 2009, she saw Dr. Mikuzis nine separate times. (R. 360-380). During each visit, she indicated that she was still suffering from

---

[2] Dr. Rabin's office note from January 30, 2009, indicated that Ms. Fratantion was doing remarkably well, her energy was back, she had no pain in her leg, hips, or numbness. The only issue seemed to be the incision site. (R. 327).

chronic lower back pain, numbness down her right leg, issues ambulating, joint pain, as well as muscle pain and weakness. (R. 360-380). Dr. Mikuzis continued Ms. Fratantion on a variety of pain medications as well as prescribed physical therapy. (R. 377).

On June 7, 2009, Ms. Fratantion had a near fall in the grocery store which aggravated her back pain. (R. 322, 370-372). Ms. Fratantion proclaimed that her back pain was significantly worse since the incident, and that the incident negated any progress she had made to date in physical therapy. (R. 368-369, 370, 372). So, on July 23, 2009, Ms. Fratantion was referred to a new physical therapist at Action Physical Therapy. (R. 382). Her initial evaluation indicated that subjectively she was in constant pain with intensity varying from ten-out-of-ten in the mornings to five or seven out of ten throughout the day upon taking her pain medications. (R. 382).

Objective evaluation revealed signs and symptoms associated with significant muscular restriction, decreased trunk stabilization, decreased flexibility, and decreased trunk range of motion ("TROM") consistent with her diagnosis of lumbago, herniated disc, and status post-surgical repair. (R. 382). She saw the physical therapist two to three times a week until September 24, 2009, and reported to Dr. Mikuzis that the physical therapy sessions as well as pain medications had helped manage her pain. (R. 362, 364, 383, 384-385). Ms. Fratantion's discharge evaluation reported no overall improvements in her pain, however, she did demonstrate improvement in objective measurements of TROM, flexibility, and trunk stabilization. (R. 383-385).

Upon further review of the record, Dr. Richard Bilinsky, the State agency medical consultant, completed Ms. Fratantion's physical residual function capacity ("RFC") assessment on November 20, 2009. (R. 386-393). He found that Ms. Fratantion could occasionally and frequently lift ten pounds, frequently climb ramps and stairs, as well as occasionally climb

ladders, ropes, or scaffolds. (R. 387-388). He also determined that Ms. Fratantion could stand and walk for at least two hours in an eight hour work, as well as sit for at least 6 hours during an eight hour work day. (R. 387). Additionally, Ms. Fratantion's ability to push and pull were unlimited with no manipulative limitations, and she could occasionally kneel, stoop, crouch, and crawl. (R. 387-389). Dr. Bilinsky considered her allegations credible; however, the Medical Evidence of Record ("MER") did not support her limitations noted in the Activities of Daily Living ("ADL") report, and her MRI indicated good spinal alignment. (R. 393).

On December 16, 2009, Ms. Fratantion reported to the Hospital complaining of severe back pain that was intensified by bouts of coughing. (R. 436). She reported that the pain radiated across her lower back and down into both legs. (R. 437). A physical examination revealed increased pain with straight leg raises despite normal lower extremity strength and she was prescribed intravenous Dilaudid to alleviate the pain. (R. 437). Dr. Rabin order another MRI which revealed no gross compressive lesions. (R. 438, 440). He also reported that she presented no gross abnormalities on exam, and her strength was again five out of five. (R. 440). Dr. Mochel examined her flexion/extension x-rays and concluded that her major complaint stemmed from her lumbar spine, and that hip surgery was unnecessary. (R. 441-442). Dr. Rozner also examined Ms. Fratantion and reported that despite her hip pain, she was "doing well." (R. 443-444, 445).

On January 26, 2010, Dr. Schafer of the Northwestern Medical Faculty Foundation, provided a second opinion on the cause of her "severe and excruciating" lower back pain. (R. 399-401). Dr. Schafer reported that she had in fact progressed with physical therapy until her incident at the grocery store, and that an MRI with gadolinium was needed because her previous

MRI scan was very difficult to interpret due to all the scar tissue.[3] (R. 400-401). The February 15, 2010, Lumbar MRI revealed that Ms. Fratantion's vertebral alignment was within normal limits, postsurgical changes consistent with bilateral L4 and L5 laminectomies with enhancing scar tissue in the soft tissues posterior to the thecal sac at L4 and L5; mild bilateral subarticular stenoses, as well as mild right and mild to moderate left neural foraminal stenoses at L4-L5, and mild bilateral facet degenerative changes at L3, L4, L5. (R. 404-405).

Ms. Fratantion met with Dr. Schafer a third time on March 3, 2010, to discuss the results of the aforementioned MRI. (R. 398). During this visit, Dr. Schafer discussed with Ms. Fratantion and her husband that her primary problem was related to evidence of instability at L4 and L5, as there was evidence of degenerative spondylolisthesis. (R. 398). Dr. Schafer recommended fusion surgery from L3 down to the sacrum, but opined that "the canal does not need to be decompressed in any way, shape, or form." (R. 398). Moreover, Dr. Schafer indicated that the high risk spine team should handle such a procedure, however, surgery would have to wait until she was completely cigarette free for two months.[4] (R. 398).

Following her third visit to Dr. Schafer, Ms. Fratantion had her medications refilled twice by Pain Centers of Chicago, LLC on March 8, 2010, and April 5, 2010.[5] (R. 411-414). The progress notes dated March 8, 2010, indicated that Ms. Fratantion experienced some pain relief with medications without any side effects, however, radicular symptoms, numbness, and spasms persisted. (413). Her pain levels were five out of ten at their best and ten out of ten at their worst.

---

[3] Dr. Schafer also indicated that Ms. Fratantion's story about the June 8, 2009, incident in the grocery store was "kind of difficult and confusing because she kept intermingling with it just how much pain she was in." (R. 400).

[4] The record indicates that Ms. Fratantion is a heavy smoker, smoking anywhere from one-half to three-fourths a pack per day for approximately 20 years. (*See* R. 285, 289, 292, 296, 299, 302, 398, 401).

[5] The record indicates Ms. Fratantion first saw Dr. Tubic at Pain Centers of Chicago, LLC on February 8, 2010, after being referred by a friend. She reported pain scores of three, seven, and ten out of ten on a daily basis, and Dr. Tubic diagnosed her condition as post laminectomy syndrome. (R. 415-417).

(R. 413). Objective findings indicated that she ambulated without assistance, she was oriented, and her consciousness was intact. (R. 414). Diagnosis was post-laminectomy syndrome in the lumbar spine region, and the pain specialist increased her Neurontin, continued the Valium and Percocet, added Zanaflex for the spasms, and changed her fentanyl patch. (R. 414).

During the April 5, 2010, visit, Ms. Fratantion reported her pain was increasing over the last four to five days due to financial stress and the prospect of losing her home. (R. 411). She reported that the Zanaflex was helping with the spasms but made her drowsy, and the Duragesic patch was working well with being changed every forty-eight hours, and reported pain scores ranging from six to ten out of ten. (R. 411). Objective findings were consistent with her previous visit and the pain specialist recommended medication refills twice a month. (R. 412).

Dr. George Andrews, a second State agency medical consultant, affirmed Dr. Bilinsky's prior RFC determination on April 12, 2010. (R. 452-454). Dr. Andrews found that upon reconsideration Ms. Fratantion's MRI dated February 16, 2010 was consistent with bilateral L4 and L5 laminectomies. (R. 454). Moreover, Dr. Andrews also determined that the ADLs appeared generally credible before affirming Dr. Bilinsky's November 20, 2009, RFC. (R. 454).

In a letter dated November 16, 2010, one day before the ALJ hearing, Ms. Fratantion visited Dr. Rozner for a letter of disability. (R. 456). Dr. Rozner's letter stated that she was "doing HORRIBLY," and in significant pain yet it responded to pain medications. (R. 456) (emphasis in original). He also noted that Ms. Fratantion had lots of problems moving around the house and "MUST use a cane frequently," and she had problems with her hands making fine manipulation difficult. (R. 456) (emphasis in original). Dr. Rozner noted her primary problem was her back pain, which would eventually require the planned lumbar fusion, however, he also noted concerns that she was developing a progressive cervical related problem in her hands, neck

disorder symptoms, as well as still suffering from tobacco use disorder, but she was "doing VERY well." (R. 457) (emphasis in original).

The record remained open upon the conclusion of the hearing. (R. 15). Although Ms. Fratantion did not specifically request this, she did submit evidence following the conclusion of the hearing, which the ALJ accepted and considered. (R. 15).

## C.
### The Administrative Hearing Testimony

At the administrative hearing, Ms. Fratantion's attorney argued that she was disabled to due spinal stenosis, her laminectomy, and subsequent complications from her laminectomy that resulted in staph infection. (R. 77). Moreover, he argued that these conditions satisfy Listing 1.02, Major Dysfunction of a Joint Due to Any Cause, as well as Listing 1.04, Disorders of the Spine. (R. 77). He indicated that she is in significant pain which caused her persistent struggles with daily functions, and that she "certainly would not be able to engage in any substantive, gainful employment – even at the sedentary level." (R. 78).

## 1.
### The Plaintiff's Testimony

Ms. Fratantion testified that she originally hurt herself on April 1, 2007, and as a result of her injury underwent a decompressive laminectomy. (R. 39, 42). She further indicated that she had a valid driver's license, she had completed two years of general college courses, and had not worked since her alleged onset date. (R. 39).

Ms. Fratantion testified that her most recent job was working for the food service company, Sodexo, where she served/prepared lunches at Plainfield South High School from 2004 to 2007. (R. 39, 53). At Plainfield South High School she prepared the meals for the elementary and junior high school students which required her to lift serving pans weighing forty

11

to fifty pounds. (R. 52). Additionally, the job required her to stand for six hours because there "was nowhere to sit," unless you took a lunch break, which was only after all the kids were served. (R. 53).

Ms. Fratantion also answered a number of questions from the ALJ regarding her limitations. She maintained that she was going to the pain clinic every two months for medication refills, that the only medication side effect is drowsiness caused by Tizanidine[6], and that she had trouble walking. (R. 41). Additionally, she indicated that she had difficulties performing normal daily activities such as: bending over to retrieve clothes from the dryer; walking two house down the street; going to the grocery store to get milk, and bread has become difficult because she can only lift a gallon of milk with both hands; and general household chores are difficult because she has to constantly rest. (R. 43-44). When asked how long she could sit comfortably, Ms. Fratantion responded that she can only sit comfortably in her recliner chair for approximately fifteen to twenty minutes at a time before having to stand. (R. 44-45). Once standing, she testified that she can only walk for a half an hour at most, and when at the store has to have a cart or her cane for added stability. (R. 45). She indicated that she started using the cane more frequently during the day within the last month prior to the hearing, but always used the cane in the mornings. (R. 45).

She also testified that within the last two to three months her hands had begun to feel numb. (R. 46). However, she can still zip, write, handle light objects, and button shirts. (R. 46). Further, she claimed she paid her bills on the computer, but could only work at twenty minute intervals before needing a rest. (R. 46). When asked about her ability to independently perform

---

[6] Tizanidine is also commonly referred to as Zanaflex, which the record indicates Ms. Fratantion was prescribed to combat muscle spasms. *See* MedlinePlus (May 27, 2014), http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601121.html; (R. 411). Ms. Fratantion testified she could only take Tizanidine when she was stationary because within an half an hour she is "out like a light." (R. 41).

personal grooming: shaving, showering, combing her hair, putting on clothes, etc., Ms. Fratantion testified that the only difficulty she encountered was drying her hair, which she "usually has [her] girls do." (R. 46). Ms. Fratantion also indicated that she was limited to cooking only frozen meals, that she can place dishes in the dishwasher, and that she no longer goes out socially. (R. 48-50).

Ms. Fratantion further testified that she had lots of difficulties sleeping, with a good night's sleep being four hours; that she could drive short distances of approximately thirty to forty-five minutes to the grocery store; and that she could only manipulate a pen for approximately ten to fifteen minutes before needing a rest. (R. 54, 56, 60). Ms. Fratantion also that she had been feeling depressed recently due to losing her home, as well as insurance coverage. (R. 62). She indicated that Dr. Rozner prescribed Lexapro in order to alleviate some of the stress, but he did not feel as though she needed to see a counselor, or psychologist. (R. 62). Dr. Rozner asked her about seeing someone in regards to her depression which she ultimately declined. (R. 63).

## 2.
## The Witness' Testimony

Leah Fratantion, Ms. Fratantion's daughter, testified as to her mother's alleged limitations, as well as to the assistance she provided for her mother on a daily basis. (R. 64-68). She testified that she helped her mother with the laundry, preparing dinner, and taking her to the store if the trip takes longer than thirty to forty-five minutes. (R. 65). She indicated that her mother needs constant assistance because the pain causes her to walk slowly, and causes great difficulties while trying to load and unload groceries. (R. 65). She further explained that her mother "drags her feet" because she can only lift them so much. (R. 65). However, she admitted that if her mother used her cane she did not need the assistance of another person. (R. 67). She

also testified that she noticed her mother "go in and out all day [of consciousness]" as a result of taking the Tizanidine. (R. 68). Finally, she indicated that her mother does not sleep well at night because she cannot find a comfortable position on the recliner chair she sits in, so if she notices her mother sleeping she tries not to wake her up. (R. 68).

### 3.
### The Vocational Expert's Testimony

Grace Gianforte testified as the vocational expert ("VE") at the hearing. (R. 68-76). The VE began by reviewing Ms. Fratantion's past relevant work. (R. 70-71). She described Ms. Fratantion's job with Sodexo as a hybrid type of job because it involved time spent working as a food server – having a specific vocation preparation ("SVP") of two, which is unskilled with a light level of physical tolerance per the Dictionary of Occupational Titles ("DOT"). (R. 70-71). The job also involved time spent as a deli server and cashier – both SVP of two, light level of physical tolerance per the DOT, and unskilled; as well as work as a sandwich maker, which is a medium level of physical tolerance per the DOT, an SVP of two, and also unskilled. (R. 71). The VE testified that the occupation of magazine merchandiser had an SVP of four, medium in exertion per the DOT, and was semi-skilled while the retail sales clerk was again a light level of physical tolerance per the DOT with SVP of three. (R. 71).

The VE testified that, considering " Ms. Fratantion's age, education level, work experience, RFC to perform sedentary work,…frequently climb stairs and ramps, occasionally climb ladders, ropes, scaffolds,…occasionally stoop, kneel, crouch, and crawl," that Ms. Fratantion could perform sedentary work. (R. 71-72). She provided three examples of such jobs: security monitor with an SVP of two, and 3,000 jobs in the Chicago metropolitan region at the

time of the hearing;[7] addresser with an SVP of two, and approximately 1,500 jobs in the regional economy; and document preparer with an SVP of two with approximately 1,200 jobs existing in the regional economy. (R. 71-72).

Further, the VE confirmed that Ms. Fratantion could perform the three sedentary occupations listed above even considering that she needs to alternate sitting and standing within every hour, can only stand for ten minutes, can use both hands for gross and fine manipulation activities, but cannot reach overhead well. (R. 72). However, the VE admitted that, should she be off task for more than twenty percent of a work day "due to pain, frequent alternating of positions from sitting to standing and pacing which results in inability to sustain focus," these circumstances would be work preclusive. (R. 72-73).

### III.
### The ALJ's Decision

The ALJ found that Ms. Fratantion was not disabled under the meaning within the Social Security Act from the alleged onset date of April 1, 2007, through the date last insured of March 31, 2010. (R. 15). To start, the ALJ concluded that Ms. Fratantion had not engaged in substantial gainful activity during the period of her alleged onset date through her date last insured. (R. 17); *see* 20 C.F.R. § 404.1571 *et seq*. She also concluded that Ms. Fratantion suffered from the following severe impairments: degenerative disc disease of the lumbar spine, status post laminectomy; obesity; and, hypertension. (R. 17); 20 C.F.R. § 404.1520(c). The ALJ also determined that Ms. Fratantion's alleged impairments of irritable bowel syndrome, gastritis, and anxiety were not severe because no evidence existed indicating that she had any significant treatment for these ailments. (R. 17-18). The ALJ admitted that the record demonstrated that Ms.

---

[7] Because Ms. Fratantion's past relevant work was light and medium exertion, the ALJ noted that Ms. Fratantion could not perform her previous jobs, thus, in accordance with her RFC, the ALJ asked the VE to testify as to what sedentary jobs Ms. Fratantion could still perform. (R. 71-72).

Fratantion received medical attention from both Dr. Mikuzis, who prescribed Xanax, and Dr. Rozner, who prescribed Lexapro, but there was no diagnosis of anxiety or depression by a psychologist or psychiatrist; and, "more importantly, no evidence to support [Ms. Fratantion] has any limitation in the 'paragraph B' criteria of Listings 12.04 and 12.06." (R. 18); *see* 20 C.F.R. Part 404, Subpart P, Appendix 1.

Because the ALJ found Ms. Fratantion to have at least one severe impairment, she continued to Step Three in the sequential analysis and determined that Ms. Fratantion's severe impairment or combination of impairments did not meet or medically equal one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1. (R. 18). The ALJ said she considered all the Listings independently, but focused specifically on Listings 1.02, major dysfunction of a joint due to any cause, and 1.04, disorders of the spine, as these were the two listings her attorney argued in his pre-hearing brief, and again at the hearing. (R. 18). The ALJ explained that although the medical evidence indicated that Ms. Fratantion complained of hip pain, the diagnostic evidence in the record shows only mild degenerative changes in her hip, and that the hip pain was primarily a result of her degenerative spine. (R. 19). The ALJ found that no evidence existed of "medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the hip, only some degenerative changes." (R. 19); *see* 20 C.F.R., Part 404, Subpart P, Appendix 1, Listing 1.02.

With regard to Listing 1.04, the ALJ concluded that the record contained no evidence of the "compromise of a nerve root or the spinal cord, or physical examination findings of significant motor loss, sensory loss, or reflex loss, of appreciable duration, during the period under consideration, which is what Listing 1.04 required." (R. 19). The ALJ continued by finding that Ms. Fratantion's hypertension, which is evaluated by its effect on other body

systems, did not singly or in combination with other impairments, meet or medically equal a listed impairment in 20 C.F.R., Part 404, Subpart P, Appendix 1. (R. 19). The record indicated that she has poorly controlled hypertension, but there is no evidence that it has negatively impacted her internal organs. (R. 19). The ALJ also considered her obesity. Standing 5' 7" tall and weighing 231 pounds, Ms. Fratantion has a body mass index ("BMI") of 36.2[8]. (R. 19). The ALJ concluded that no evidence suggested that she reported any function limitations resulting from her obesity, or that her obesity in combination with other impairments has caused any physical complications. (R. 20).

At Step Four, the ALJ found that Ms. Fratantion had the RFC to perform sedentary work as defined in 20 CFR 404.1567(a) except: she could occasionally climb ladders, ropes, scaffolds; could frequently climb ramps and stairs; could occasionally balance, stoop, kneel, crouch, and crawl; and she had to avoid concentrated exposure to hazards, such as moving machinery, and unprotected heights. (R. 20). In arriving at her conclusion, the ALJ reviewed the evidence at length, including the testimony of Ms. Fratantion and Leah Fratantion, as well as the medical records from Dr. Rabin, Dr. Aliga, Dr. Augustinsky, Dr. Mikuzis, Dr. Mochel, Dr. Schafer, Dr. Rozner, the State agency medical consultants, and the Pain Centers. (R. 21-28). After careful consideration of the evidence, the ALJ concluded that Ms. Fratantion's allegations were not fully credible "concerning the intensity, persistence, and limiting effects of these symptoms to the extent they are inconsistent with the above RFC assessment." (R. 22).

Furthermore, the ALJ concluded that her pain complaints are disproportionate to objective medical findings. (R. 25). This was because the record demonstrated that she received limited physical therapy; visits to the pain clinic are only every two months; she ambulates

---

[8] For adult men and women, a BMI over 30.0 is classified as obese. Morbid obesity is a BMI greater than or equal to 40.0.

without assistance and proclaimed pain was managed with medications; and, that decompressive surgery was not required. (R. 25). She continued that there is no opinion from a back specialist or pain physician in the record, and the RFC assessment is identical to the Disability Determination Services consultants. (R. 27).

The ALJ gave little weight to the testimony of Ms. Fratantion's daughter, Leah Fratantion, as well as to the medical opinion of Dr. Rozner. (R. 26). In regards to Leah Fratantion, the ALJ noted that her opinion, although somewhat corroborative, merely reiterated Ms. Fratantion's subjective allegations. (R. 26). With regard to Dr. Rozner, the ALJ indicated that given the lack of objective evidence provided in support of his opinions his assessment seemed to be more an attempt to help a longtime patient rather than an "objective assessment of Ms. Fratantion's abilities." (R.26). Moreover, Dr. Rozner indicated no abnormalities, and that Ms. Fratantion    responded well to pain medications, which contradicted her testimony that nothing alleviates the pain. (R. 26). On the other hand, the ALJ gave substantial weight to the findings of the State agency consultants. (R. 27). She explained that the consultants' findings were in accordance with the objective medical evidence in the record at both the initial and reconsideration levels because the consultants found that Ms. Fratantion was capable of performing sedentary work which was consistent with the objective evidence within the record. (R. 27).

The ALJ concluded that Ms. Fratantion could not perform any past relevant work. (R. 28). However, the ALJ found that she was capable of performing sedentary work as a security monitor; addresser; and document preparer in accordance with her specific limitations. (R. 28-29). All of which, the ALJ noted, existed in large numbers in the regional economy. (R. 29). Therefore, having found the VE's testimony consistent with the information contained in the

DOT, the ALJ found that Ms. Fratantion was not under a disability from the alleged onset date of April 1, 2007 through the date last insured of March 31, 2010. (R. 29).

**IV.**
**DISCUSSION**

**A.**
**The Standard of Review**

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla," and is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir.2008), *citing Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L.Ed.2d 842 (1971).

We review the ALJ's decision directly, but we do so deferentially, *Weatherbee v. Astrue*, 649 F.3d 565, 568–69 (7th Cir.2011), and we play an ''extremely limited'' role. *Simila v. Astrue*, 573 F.3d 503, 513–514 (7th Cir.2009); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir.2008). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir.2009); *Berger*, 516 F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder*, 529 F.3d at 413; *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir.1997). However, conclusions of law are not entitled to such deference and, if the ALJ commits an error of law, the decision must be reversed. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir.2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir.2002). In order

for the court to affirm a denial of benefits, the ALJ must "minimally articulate" the reasons for her decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir.2001). This means that the ALJ "must build an accurate and logical bridge from [the] evidence to [the] conclusion." *Dixon*, 270 F.3d at 1176; *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007). It's also called a "lax" standard. *Berger*, 516 F.3d at 544. Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir.1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir.2009). This means that the ALJ must rest a denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade. *Eichstadt v. Astrue*, 534 F.3d 663, 665-66 (7th Cir. 2008).

### B.
### The Five-Step Sequential Analysis

The term ''disability'' is defined in Section 423(d)(1) of the Act as an ''inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'' 42 U.S.C. § 423(d)(1)(A); *Stanley v. Astrue*, 410 F. App'x 974, 976 (7th Cir.2011); *Liskowitz v. Astrue,* 559 F.3d 736, 739-40 (7th Cir.2009). The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila*, 573 F.3d at 512–13; *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351–52 (7th Cir. 2005). An affirmative answer leads either to the next Step or, on Steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. § 416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir.1990). A negative answer at any point, other than Step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. § 404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through Step Four; if it is met, the burden shifts to the Commissioner at Step Five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater*, 103 F.3d 1384, 1391 (7th Cir.1997).

## C.
### Analysis

Ms. Fratantion raises numerous criticisms of the ALJ's decision. She asserts that: 1) the ALJ erred at Step 2 by not listing "failed back surgery syndrome" as a severe impairment which should be reviewed under Listing 1.03; 2) the ALJ did not consider her pain limitations supported by the record in the RFC analysis; 3) the ALJ failed to adequately consider her obesity; 4) the ALJ failed to meet its burden at Step Five; and 5) the ALJ's credibility determination is flawed because her use of boilerplate language demonstrates that she did not carefully examine the record, and she failed to properly evaluate the seven factors listed in 20 C.F.R. 404.1529(c). (*Plaintiff's Memorandum* 11-18) (hereinafter Pl.'s Mem.). As this final argument necessities remand, we focus on it.

**1.**

**The ALJ's Credibility Determination**

An ALJ does not need to discuss every piece of evidence in the record, *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009), nor does the decision need to be flawless. *See Outlaw*, 412 F. App'x at 899; *see also Simila*, 573 F.3d at 517. Thus, ALJ credibility determinations are given special deference. *Castile*, 617 F.3d at 929; *Briscoe*, 425 F.3d at 354; *Craft*, 539 F.3d at 678. Only when it is patently wrong or lacking substantial support will the ALJ's credibility determination be reversed. *Jones,* 623 F.3d at 1162; *Elder*, 529 F.3d at 413-14; *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006).

But, an ALJ must support her credibility finding with articulated reasoning based on evidence in the record. *See Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *Pepper*, 712 F.3d at 367. In making judgments about the veracity of a claimant's claimed symptoms, including pain, the ALJ, in addition to considering the objective medical evidence, must consider the following in totality: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, that the claimant receives or has received for relief of pain or other symptoms; (6) any measures the claimant uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

**a.**

**The ALJ's Use of Boilerplate Language**

Ms. Fratantion's first credibility criticism, albeit confusing, concerns the ever common ALJ language, "After careful examination of the evidence,…the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Pl.'s Mem. at 15). This boilerplate

language, Ms. Fratantion argues, indicates that the ALJ failed to undertake a careful examination of the record.

The Seventh Circuit has repeatedly criticized the ALJ's use of this boilerplate language when concluding that the claimant's testimony was not entirely credible. *See e.g., Bjornson v. Astrue*, 671 F.3d 640, 644-46 (7th Cir. 2012) (referring to the ALJ's use of boilerplate language in regards to Bjornson's credibility as "opaque"); *Parker v. Astrue*, 597 F.3d 920, 921-22 (7th Cir. 2010) (holding that the ALJ's boilerplate language in discrediting Parker's allegations was "meaningless"); *Pepper v. Colvin*, 712 F.3d 351, 367-69 (7th Cir. 2013) (noting that the ALJ's boilerplate language fails to demonstrate how this conclusory statement is supported by objective medical evidence); *Punzio v. Astrue*, 630 F.3d 704, 709-10 (7th Cir. 2011) ("read[ing] the ALJ's boilerplate credibility assessment is enough to know that it is inadequate and not supported by substantial evidence"). Additionally, this boilerplate language provides no insight into which statements the ALJ found credible and which she found were not, *Martinez*, 630 F.3d at 697, while also implying that determining the claimant's ability to work is then used to determine her credibility, which is backwards. *Bjornson*, 671 F.3d at 645.

The use of this sort of boilerplate language, by itself, is inadequate to support a credibility finding. *Spiva v. Astrue*, 628 F.3d 346, 348 (7th Cir. 2012); *Richison v. Astrue*, 462 F. App'x 622, 625 (7th Cir. 2012). However, merely using this boilerplate language does not automatically discredit the ALJ's conclusion so long as she provides evidence that justifies her credibility determination. *Pepper*, 712 F.3d at 367; *see Punzio*, 630 F.3d at 709; *see also Getch*, 539 F.3d at 483.

Here, the ALJ attempted to provide substantial evidence for her adverse determination by recounting Ms. Fratantion's medical history. However, her explanations are not supported by substantial evidence. *See Hopgood*, 578 F.3d at 698. The ALJ relied heavily on the treatment notes from Dr. Rabin, and Dr. Mikuzis. (R. 22-25). She remarked on numerous occasions that Dr. Rabin's treatment notes reported that Ms. Fratantion's preoperative symptoms were completely resolved after her initial laminectomy, that her energy had returned, and MRIs indicated normal alignment. Further, that Dr.

Mikuzis reported she had no trouble ambulating, and that medications controlled pain well. From this, the ALJ concluded that Ms. Fratantion was exaggerating the severity of her back and leg pain.

But, SSR 96-7(4) states that a claimant's statements with regards to the intensity and persistence of pain may not be disregarded solely because they are inconsistent with objective medical evidence. *Pierce v. Colvin*, 739 F.3d 1046 (7th Cir. 2014); *Thomas v. Colvin*, 745 F.3d 802, 806-7 (7th Cir. 2014). Moreover, the ALJ never addressed the fact that each of Dr. Mikuzis' treatment notes indicated that Ms. Fratantion had trouble ambulating. Because of this, the ALJ failed to explain adequately how her conclusion was supported by objective medical evidence. *Pepper*, 712 F.3d at 367-69.

**b.**
**The Seven Factors of 1529(c)(3)**

Ms. Fratantion's second criticism of the ALJ's credibility determination asserts that the ALJ failed to properly consider the seven factors listed in 20 C.F.R. 404.1529(c) when making her determination. (Pl.'s Mem. at 16). For the reasons discussed below, the ALJ improperly discredited Ms. Fratantion's alleged symptoms.

Here, the ALJ reviewed Ms. Fratantion's alleged complaints, including back, leg, and hip pain, drowsiness caused by her medications, and medical history finding that Ms. Fratantion's alleged pain complaints where disproportionate to the objective medical findings. (R. 25). Additionally, the ALJ noted that Ms. Fratantion's reported daily activities included morning back pain, taking medication and using a heat pad, doing some light housework, paying bills, is able to drive and shop, and has no problem with personal care, however, has difficulties lifting, squatting, bending, standing, sitting, kneeling, reaching, walking, and climbing stairs. (R. 25). But, it should be noted, that although the ALJ may appropriately consider a claimant's daily activities, she should not place undue weight on these activities when determining a claimant's ability to perform gainful activity outside the home. *Craft*, 539 F.3d at 680; *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006); *Gentle*, 430 F.3d at 867.

The ALJ continued that although the record supports some level of pain, it does not support disabling levels. (R. 25). In support of her determination, the ALJ indicated that the record demonstrates

limited physical therapy, that Ms. Fratantion only visits the pain clinic every two months for medication refills, treatment notes indicated her preoperative symptoms were completely resolved, and that she could ambulate without assistance. (R. 25). In reaching this conclusion the ALJ relied almost completely on objective medical evidence. The Seventh Circuit, on numerous occasions, has cautioned that although a claimant's complaints are not substantiated by objective medical evidence, an ALJ cannot disregard those complaints for this reason alone. *See Sawyer v. Colvin*, 512 F. App'x 603, 607 (7th Cir. 2013); *Filus v. Astrue*, 694 F.3d 863, 869 (7th Cir. 2012); *Thomas*, 745 F.3d at 807; *Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009).

Because the ALJ relied solely on the medical evidence to discredit Ms. Fratantion, her credibility determination is flawed and this matter must be remanded. The ALJ did not discuss the side effects of Ms. Fratantion's medication, or any other factors concerning her functional limitations and restrictions due to pain or other symptoms. This error is most notable with regard to Ms. Fratantion's testimony that her spasm medication makes her "very drowsy," thus she naps one to two times a day for approximately one to one and a half hours. (R. 54, 411). The ALJ does not discuss the evidence in the record that corroborates her reported medication side effects, or how she can perform even sedentary work while having to nap one to two times per day. *See Schomas v. Colvin*, 732 F.3d 702, 709 (7th Cir. 2013) (concluding that the ALJ erred by not explaining why he did not believe Schomas' statements that his medication made him "tired and groggy" resulting in loss of focus and constant napping in light of the VE's testimony that focus levels below 85% is work preclusive); *see also Terry*, 580 F.3d at 477-78 (explaining that the ALJ's adverse credibility determination based on Terry's failure to report medication side effects was wrong especially when Terry reported to her physician that her medications made her drowsy); *see also Flores v. Massanari*, 19 F. App'x 393, 400 (7th Cir. 2001) (holding that the ALJ failed to adequately assess Flores' medication side effects given that progress reports from three separate doctors, as well as his stepdaughter's testimony, indicated noticeable adverse effects).

In this case, Ms. Fratantion reported to her pain clinic nurse that her spasm medication made her drowsy, (R. 411), yet the ALJ offered no further explanation as to why she did not credit these statements.

The ALJ relied solely on the inconsistencies in the objective medical evidence without providing any explanation of the evidence supporting Ms. Fratantion's statements. *See Thomas*, 745 F.3d at 806 (explaining that an ALJ must articulate her reasons for rejecting an entire line of evidence).

The ALJ also erred by finding that Ms. Fratantion's level of pain was not debilitating because she did not seek "frequent or even repeated emergency room treatment for back pain," and that the record did not support a significant failure of surgery. (R. 27). The record is replete with objective medical evidence that Ms. Fratantion is in severe pain that required frequent trips to the Hospital, to her treating physician, her neurosurgeons, and pain clinics. *Cf. Schomas*, 732 F.3d at 709 (noting that the ALJ's conclusion that Schomas was not in disabling pain due to infrequent hospitalization and emergency room visits rest[s] on "shaky grounds." "Unless emergency treatment [for continuous pain] can be expected to result in *relief*, unscheduled treatment in fact makes no sense") (emphasis in original).

Further, the record contains a plethora of objective medical evidence demonstrating that Ms. Fratantion's first surgery was a failure. Although Dr. Schafer has postponed Ms. Fratantion's three-level fusion until she has ceased smoking for two months, the fact remains that she is still in need of future surgery to correct her symptoms.[9] The ALJ improperly inferred that Ms. Fratantion's first surgery was not a failure because of the fusion surgery postponement and Dr. Schafer's opinion that decompression was not necessary. (R. 25, 27); *Cf. Rohan*, 98 F.3d at 970 ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings"); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("We have explained that an ALJ cannot disregard medical evidence simply because it is at odds with the ALJ's own unqualified opinion"). The record demonstrates that Ms. Fratantion still suffers from chronic pain in her lower back and legs consistent with recent MRIs indicating degenerative spondylolisthesis and instability at L4-L5. The ALJ never explained why these records were not considered. *See Herron*, 19 F.3d at 333.

---

[9] The record also indicates that Ms. Fratantion is postponing surgery due to fear of undergoing yet another operation because Dr. Schafer explained that this surgery will be very painful and that she has a high risk of postoperative infection. (R. 42, 59, 61, 398-399).

Ms. Fratantion also contends that the ALJ erred in her credibility determination when the ALJ concluded that Ms. Fratantion's inability to completely stop smoking cigarettes reflected poorly on her credibility. (Pl.'s Mem. at 17-18). It is true that a failure to follow a prescribed treatment plan may undermine a claimant's credibility, however, an ALJ must explore the claimant's reasons for the lack of medical care before drawing a negative inference against them. SSR 96-7p; *Shauger*, 675 F.3d at 696; *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir.2009). More importantly, reliance on the failure to cease smoking is a misuse of the non-compliance regulation, 20 C.F.R. § 404.1530(a), given the highly addictive nature of cigarettes and is an unreliable basis on which to rest a credibility determination. *Shamrek*, 226 F.3d at 812-13; *see Rousey v. Heckler*, 771 F.2d 1065, 1069 (7th Cir. 1985). The ALJ opined that Ms. Fratantion's inability to cease smoking, despite Dr. Schafer's request, reflected poorly on her credibility of having disabling back pain. (R. 25). At the hearing, the ALJ simply asked how Ms. Fratantion's efforts were going, to which she replied "doing well" although she had not stopped completely. (R. 42). No further inquiry was made into her efforts to cease smoking.

Because the ALJ's credibility determination focused solely on inconsistencies between Ms. Fratantion's subjective complaints and the objective medical evidence, remand is required. *See Villano*, 556 F.3d at 562 ("disbeliev[ing] [a claimant's] testimony about her inability to sit (albeit in the course of his RFC analysis) because no medical evidence supported such a limitation," alone, is an insufficient reason to discredit her testimony); *Pierce*, 739 F.3d at 1049-50 (7th Cir. 2014) (explaining that an ALJ may not discount a claimant's credibility merely because her pain complaints are unsupported by significant physical and diagnostic examination results); *Thomas*, 745 F.3d at 806-7 ("A lack of medical evidence supporting the severity of a claimant's symptoms is insufficient, standing alone, to discredit her testimony"); SSR 96-7p. No other explanation was provided as to why she did not consider the plethora of objective evidence that is actually quite consistent with Ms. Fratantion's alleged pain. Therefore, the ALJ failed to build a logical bridge between the evidence and her conclusion, thus necessitating remand. *Dixon*, 270 F.3d at 1176; *Giles*, 483 F.3d at 486; *Parker*, 597 F.3d at 921.

Although this argument alone necessitates remand in this case, it is worthwhile to examine Ms. Fratantion's remaining arguments. As will be discussed in more detail below, her remaining arguments are not persuasive.

## 2.
## The ALJ Did Not Need to Recognize "Failed Back Surgery Syndrome" as an Additional Impairment

Ms. Fratantion's next contention is that the ALJ erred at Step Two by failing to recognize her "failed back surgery syndrome" ("FBSS") [10] as an additional severe impairment, which should then be reviewed under Listing 1.03 [11]. (Pl.'s Mem. at 11). She continues by asserting that this error affected the ALJ's Step Three analysis, RFC analysis, and credibility analysis. (Pl.'s Mem. at 13).

At Step Two of the sequential evaluation process, the ALJ must determine whether the claimant has a medically determinable impairment that is either singly severe or in combination with other impairments severe. 20 C.F.R. § 404.1520(c). Generally, an ALJ must consider only impairments alleged by a claimant or about which she receives evidence. *See e.g., Eichstadt*, 534 F.3d at 668; *Scott v. Astrue*, 647 F.3d 734, 741 (7th Cir. 2011); *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006).

Ms. Fratantion argues that the diagnostic evidence in the record demonstrates that she suffers from FBSS because her initial decompressive laminectomy did not alleviate her

---

[10] FBSS refers to chronic back and/or leg pain occurring after a patient undergoes back surgery. Common symptoms include diffuse, dull and aching pain involving the back and/or legs. Abnormal sensibility may include sharp, pricking, and stabbing pain in the extremities. Additionally, other factors can contribute to its onset or development: residual or recurrent disc herniation, persistent post-operative pressure on a spinal nerve, altered joint mobility, joint hypermobility with instability, scar tissue (fibrosis), depression, anxiety, sleeplessness and spinal muscular deconditioning. An individual may be predisposed to the development of FBS due to systemic disorders such as diabetes, autoimmune disease and peripheral blood vessels (vascular) disease. Smoking is a risk for poor recovery. *See* NYU Langone Medical Center, *Failed Back Surgery Syndrome*, http://pain-medicine.med.nyu.edu/patient-care/conditions-we-treat/failed-back-surgery-syndrome (last visited June 24, 2014).

[11] *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 1.03 ("Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset").

preoperative symptoms, Dr. Schafer has recommended fusion surgery, and that both Dr. Mikuzis and Dr. Tubic diagnosed her with post-laminectomy syndrome, "an alternative term for FBSS." (Pl.'s Mem. at 12). At Step Two, the ALJ concluded that, among other severe impairments, Ms. Fratantion suffered from degenerative disc disease of the lumbar spine, status post-laminectomy. (R. 17). In doing so, the ALJ addressed all of Ms. Fratantion's alleged lower back and leg pain. Because her symptoms are nearly identical to those associated with FBSS, the Commissioner properly argues, that adding the label "failed back surgery syndrome" would add nothing. (*Commissioner's Memorandum* at 4).

Additionally, Ms. Fratantion makes no other mention of Listing 1.03, other than in her argument heading. "[I]t is not this court's responsibility to research and construct the parties' arguments, and conclusory analysis will be construed as waiver." *Carter v. Astrue*, 413 F. App'x 899, 906 (7th Cir. 2011) (*quoting Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 704 (7th Cir. 2010)). Even had this argument not been waived, the ALJ adequately considered all listings, specifically Listings 1.02 and 1.04 which were argued in Ms. Fratantion's pre-hearing memorandum as well as during the hearing. (R. 18-19, 77-78, 134-138).

Because the ALJ adequately considered Ms. Fratantion's lower back and leg pain, explicitly recognizing FBSS would similarly have no effects on the ALJ's analyses at Step Three, the RFC assessment, or the credibility determination. It is true that the objective evidence demonstrates that Ms. Fratantion's first surgery was a failure, however, adding the label FBSS would not have altered the outcomes at these Steps.

### 3.
### The RFC Analysis

Ms. Fratantion raises two reasons as to why the ALJ did not properly consider her medically supported pain limitations when conducting the RFC analysis. First, the ALJ did not

discuss why she gave substantial weight to the opinions of the State agency consultants, and second, that the ALJ did not consider all of her impairments in the aggregate. (Pl.'s Mem. at 14).

The RFC assessment is a consideration of the maximum things that a claimant can accomplish despite her mental and physical limitations to determine what types of work she can perform. 20 C.F.R. § 404.1545(a)(1); *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008). In reviewing the ALJ's decision, a court cannot reweigh the evidence, resolve conflicts in the record, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004); *McKinzey*, 641 F.3d at 899; *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). If substantial evidence exists to support that decision, the court must affirm the ALJ's decision. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007). The ALJ is not required to discuss in precise detail her evaluation of every piece of evidence in the record; rather she must allow a reviewing court to "trace the path of her reasoning." *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996). The ALJ need only to include the limitations in her RFC determination that were supported by the medical evidence and that she found to be credible. *Outlaw v. Astrue*, 412 Fed. Appx. 894, 898 (7th Cir. 2011); SSR96-8p.

**a.**
**The ALJ Properly Weighed the Medical Evidence**

Ms. Fratantion contends that the ALJ improperly weighed medical opinions because the ALJ did not adequately discuss why the opinions of Dr. Bilinsky and Dr. Andrews, the State agency consultants, were afforded substantial weight. (Pl.'s Mem. at 14). Contrary to Ms. Fratantion's assertion, the ALJ adequately explained how she weighed the medical evidence.

The ALJ began with a discussion on the opinion evidence provided by Dr. Rozner and why she afforded his opinion little weight. (R. 26). It is true that an ALJ may accord greater weight to opinions from treating physicians, because they may be the sources who can best

provide a "detailed, longitudinal picture" of the claimant's medical condition. 20 C.F.R. § 404.1527(d)(2); *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). But, the ALJ only needs to give a treating physician's opinion controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in the record. *Id.*; *see also White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005). The ALJ is free to discount the opinion of the treating physician so long as she provides good reasons for doing so. 20 C.F.R. § 404.1527(d)(2); *Clifford*, 227 F.3d at 870; *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011).

Ultimately, the weight accorded a treating physician's opinion must balance all the circumstances, with recognition that, while a treating physician "has spent more time with the claimant," the treating physician may also "bend over backwards" to assist a patient in obtaining benefits ... [and] is often not a specialist in the patient's ailments, as the other physicians who give evidence in a disability case usually are." *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006) (internal citations omitted); *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985) ("The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability").

The ALJ acknowledged that Dr. Rozner was a longtime treating physician to Ms. Fratantion, but he was not a specialist. (R. 26). She continued that on the day before the hearing Dr. Rozner wrote Ms. Fratantion a disability letter at her request. (R. 26, 456-458). The ALJ cited the letter verbatim in her decision, and concluded that Dr. Rozner's findings were nothing more than a reiteration of her subjective allegations without any objective support. (R. 26); *see Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010) (recognizing that a doctor's conclusions about a claimant's subjective complaint or symptom is actually the opposite of objective medical

evidence); *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (holding that an ALJ may discredit a doctor's conclusions about a claimant's limitations if based solely on the claimant's subjective allegations); *Dixon*, 270 F.3d at 1177 ("Nonetheless, a claimant is not entitled to disability benefits simply because her physician states that she is 'disabled' or unable to work"). The ALJ concluded that Dr. Rozner's opinion was more likely a "sympathetic assessment," rather than an objective assessment of Ms. Fratantion's abilities. (R. 26); *see Hofslien*, 439 F.3d at 377.

The ALJ continued with the State agency consultants' opinions. (R. 27). She stated that in accordance with SSR 96-6p, she had considered the consultants' administrative findings of fact and because they were not inconsistent with the medical evidence she accorded them substantial weight in determining the claimant's RFC. (R. 27). She continued and remarked that she was mindful of the fact that both consultants were non-examining and non-treating expert sources. However, both limited Ms. Fratantion to sedentary work with certain postural limitations based off the medical evidence and her subjective allegations. (R. 27, 386-393, 452-454); *see McKinzey*, 641 F.3d at 844 (holding that when evidence is that of a medical opinion by a State agency physician, the ALJ must explain the weight given to their opinions). For these reasons, the ALJ afforded the State agency consultants' opinions more weight than the opinions of Dr. Rozner.

The ALJ properly explained her reasons for affording substantial weight to the opinions of the State agency consultants and for discounting Dr. Rozner's opinions. Thus, this Court finds that the ALJ's assignment of weight to medical opinions was correct.

**b.**
**The ALJ Properly Considered Ms. Fratantion's Pain Limitations**

Ms. Fratantion also argues that the ALJ failed to consider her pain limitations in aggregate. (Pl.'s Mem. at 14). Specifically, her pain "precludes her from sitting for more than fifteen to twenty minutes and standing in one place for more than five minutes," thus substantially affecting her ability to focus. (Pl.'s Mem. at 14).

An ALJ is required to consider the aggregate effect of all the claimant's alleged impairments, even if some impairments, on their own, would not be considered severe. *See* 20 C.F.R. § 404.1523; *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008); *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003). Here, the ALJ properly noted Ms. Fratantion's difficulties with standing, walking, and remaining focused. The ALJ recounted that her initial disability application alleged that she could stand for only five minutes, walk for thirty to forty-five minutes[12], and could sit for short periods of time. (R. 21). Next, the ALJ reviewed her testimony that she could only sit for fifteen to twenty minutes, walk for thirty minutes with the use of a cane, and stand for five minutes. (R. 21).

Additionally, the ALJ recounted that Ms. Fratantion is prescribed numerous narcotic pain medications, some cause her drowsiness; that she has trouble sleeping due to the intense pain; and due to her obesity, back pain, and history of surgery she cannot frequently climb ladders, ropes, or scaffolds. (R. 21-22, 27). Although the ALJ did not fully credit Ms. Fratantion's complaints, the ALJ properly addressed the aggregate effect of Ms. Fratantion's impairments during the RFC assessment. In doing so, the ALJ minimally articulated her reasons for her decision. *Berger*, 516 F.3d at 544.

---

[12] Ms. Fratantion updated her initial application in December 2009, alleging that due to increased pain she could only be on her feet for thirty minutes total. (R. 21, 206). The ALJ also noted this update in her decision during the RFC assessment. (R. 21).

**4.**
**Ms. Fratantion's Obesity**

Ms. Fratantion also argues that the ALJ failed to adequately consider her obesity at Step Three, as well as how her obesity affected her RFC assessment. (Pl.'s Mem. at 14). These arguments are not persuasive.

SSR 02-1p instructs that obesity may, in combination with other impairments or singly, meet or equal the requirements listed in the Commissioner's regulations. However, it is also true that a failure to consider a claimant's obesity may be harmless error. *Pepper*, 712 F.3d at 364; *Villano*, 556 F.3d at 562; *Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006). This is especially true when the claimant fails to explain how her obesity aggravated her condition and rendered her disabled. *Mueller v. Colvin*, 524 F. App'x 282, 286 (7th Cir. 2013); *Skarbek*, 390 F.3d at 504.

Ms. Fratantion contends that the ALJ should have considered her obesity in combination with her instability at L4-L5 which would "certainly impact her ability to ambulate effectively" as Listing 1.00(B)(2)(b) instructs. (Pl.'s Mem. at 14). At Step Three, the ALJ dedicated five paragraphs to addressing Ms. Fratantion's obesity in combination with her degenerative disc disease, and antalgic gait. (R. 19-20). The ALJ remarked that numerous treatment notes reported that Ms. Fratantion was obese. (*See* R. 20, 289, 290, 292, 296, 297, 299, 300, 363, 416). However, the medical record does not indicate that Ms. Fratantion's obesity caused any functional problems. Nor, did she allege that her obesity aggravated any of her other impairments. *See Prochaska*, 454 F.3d at 737; *see also Ribaudo*, 458 F.3d at 583 (An ALJ must consider only those impairments alleged by a claimant or those which she receives evidence).

Ms. Fratantion also argues that the ALJ did not properly discuss her obesity in connection with her RFC assessment as required by SSR 02-1p. (Pl.'s Mem. at 14). Although it

is sometimes described as an impairment, limitation, or disability, the truth remains that a person may be obese, depressed, and anxious yet still have the ability to perform gainful work. *Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005). The ALJ noted that Ms. Fratantion's obesity was a severe impairment, (R. 17), and continued that in consideration of her obesity, back impairments, and history of surgery, she had the capacity to perform sedentary work. (R. 27); *see Hoyt v. Colvin*, F. App'x 625, 628 (7th Cir. 2014) (noting that the ALJ indirectly accounted for the claimant's obesity in RFC assessment based off treating physicians who reported his height and weight); *see also Prochaska*, 454 F.3d at 737 (holding that the ALJ implicitly considered Prochaska's obesity through his review and discussion of her doctor's reports that reported she was obese).

Therefore, the burden remained on Ms. Fratantion to provide relevant medical evidence with regards to any serious functional limitations caused by her obesity. *See Ribaudo*, 458 F.3d at 583. Moreover, any error on behalf of the ALJ not discussing Ms. Fratantion's obesity further was harmless. *See Skarbek*, 390 F.3d at 504; *Prochaska*, 454 F.3d at 736-37.

**5.**
**The ALJ Properly Met Her Burden at Step 5**

Ms. Fratantion's final criticism is that the ALJ failed to meet her burden at Step Five to identify a substantial number of jobs in the National economy that she could perform. (Pl.'s Mem. at 15). The ALJ adequately identified three jobs existing in the Chicago Metropolitan region of the National economy that Ms. Fratantion could perform given the nature of her limitations.

The ALJ concluded that Ms. Fratantion could not perform her relevant past work as a food preparer/server, a retail sales clerk, or magazine merchandiser as these jobs required light to medium physical exertion. (R. 28). It was then incumbent on the ALJ to identify a substantial

number of sedentary jobs existing in the national economy in accordance with the evidence of the record, the VE's testimony, and the RFC. *See* 20 C.F.R. § 404.1565; *see also Young*, 362 F.3d at 1000; *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). Sedentary work is work that involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles such as: docket files, ledgers, and small tools. 20 C.F.R. § 404.1567 (a). "Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties, however, a job is deemed sedentary if walking and standing are required occasionally and other sedentary criteria are met." *Id.*

At the hearing, the ALJ posed three hypotheticals to the VE. (R. 71-73). The first hypothetical included the limitations set forth in Dr. Bilinsky's RFC assessment while the second excluded the ability to frequently climb stairs and ramps, and occasionally climb ladders, ropes, scaffolds, stoop, kneel, crouch, and crawl. (R. 71). To each hypothetical the VE testified that Ms. Fratantion could perform the sedentary jobs of security monitor; document preparer; and addresser.[13] (R. 72). The third hypothetical involved an individual who needed to alternate sitting and standing within every hour, and would also be off task more than twenty percent of the work day due to pain. (R. 72-73). In response to this hypothetical the VE testified that someone off-focus twenty percent of the day could not perform even sedentary work. (R. 73); *see Burnam v. Colvin*, 525 F. App'x 461, 463 (7th Cir. 2013) (recognizing that being off task between ten and fifteen percent of the work day is the commonly accepted limit for being off-task and still being able to hold down a job).

Ms. Fratantion argues that because this third hypothetical is most analogous to her situation, the ALJ erred at Step Five by concluding that the aforementioned jobs existed in

---

[13] The VE testified that approximately 3,000 jobs as a security monitor, 1,500 jobs as an addresser, and 1,200 jobs as a document preparer existed in this region of the National economy. (R. 29, 72).

substantial numbers in the regional economy that she could perform. (Pl.'s Mem. at 15). Ordinarily, an ALJ's hypothetical to a VE must include all the limitations supported by medical evidence. *Young,* 362 F.3d at 1003; *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). However, an ALJ is only required to incorporate into her hypotheticals those impairments and limitations that she accepts as credible, *Schmidt*, 496 F.3d at 846, and the ALJ did not find those added limitations credible.

Moreover, the VE was afforded the opportunity to review Ms. Fratantion's Certified Earnings Record, Work History Report, and Disability Report, as well as observe Ms. Fratantion's testimony. Access to this information allowed the VE to consider all the limitations in regards to the number of jobs she could actually perform. *Young,* 362 F.3d at 1003 ("imputing knowledge to the VE of everything in the exhibits and testimony from the hearing will be sufficient to allow an ALJ to assume that the VE included all of these limitations in her assessment of the number of jobs that the applicant can perform).

Here, the ALJ minimally articulated her reasons for concluding that Ms. Fratantion could perform the sedentary jobs discussed above that each existed in substantial numbers in the Chicago metropolitan economy. *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004); *see also Zurawski*, 245 F.3d at 886. Therefore, the ALJ properly met her burden at Step Five of the sequential analysis.

## CONCLUSION

For the aforementioned reasons the Plaintiff's motion for remand is GRANTED (Dkt. 20), her motion for summary judgment is DENIED, and the Commissioner's motion for summary judgment is DENIED.

**ENTERED:** _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 8/5/14